**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **M.A. and E.M., individually and on behalf of A.A.,**<br><br>        **Plaintiffs,**<br><br>        **v.**<br><br>**JERSEY CITY BOARD OF EDUCATION,**<br><br>        **Defendant.** | Civ. No. 14-6667 (KM) (MAH)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

M.A. and E.M. (the "Parents") are the parents of A.A. The Jersey City Board of Education (the "Board") is A.A.'s school district, although A.A. has never attended school there.

This case follows from a decision by Administrative Law Judge ("ALJ") Kimberly Moss, dated October 3, 2014. A.A. has been diagnosed with autism, and everyone agrees that her educational disabilities make her eligible for a special education program. At issue is the particular kind of program that is appropriate. After reviewing the administrative record and holding a number of hearings, the ALJ found that: (1) the testimony of the witnesses employed by the Board were credible; (2) the testimony of Bobby Newman, PhD, the Parents' expert, was not credible; and (3) the Board's proposed placement was appropriate, individualized for A.A., and designed to provide A.A. with meaningful educational benefit.

On October 24, 2014, the Parents commenced this action. Their complaint requests that the Court (1) supplement the administrative record; (2) find that the Board failed to comply with the terms of a settlement agreement that resolved an earlier due process petition; (3) rule that the proposed 2013–

1

14 proposed placement did not sufficiently provide A.A. with a free appropriate public education ("FAPE"); (4) order the Board to keep A.A. at their preferred placement unless and until she is accepted at one of the schools identified in the settlement agreement; and (5) award attorney's fees and costs.

Between May 31, 2016, and July 20, 2016, the parties filed a series of competing cross motions. Both the Parents and the Board request summary judgment. Ordinarily, that might squarely present an issue for the Court's decision, based on the legal authorities cited by the parties as applied to the administrative record.

Not so here, however. The Parents have filed a three part motion that, in some ways, logically precedes the consideration of the summary judgment motions:

    (1) The Parents' motion to supplement the administrative record (ECF No. 47);

    (2) The Parents' motion to vacate the ALJ's decision because the Parents' expert was denied reasonable access to the proposed placement (*Id.*); and

    (3) The Parents' motion to vacate the ALJ's decision due to spoliation. (*Id.*)

The Parents' motion has the potential to significantly alter the context and even the appropriateness of summary judgment. I have therefore decided, within my discretion, to limit this opinion to the Parents' requests to supplement the administrative record and to vacate the ALJ's decision based on violations of procedural rights and spoliation. (ECF no. 47) For the reasons stated below, part 1 is GRANTED to the extent that the Parents will be permitted to supplement the administrative record as specified below, but the request to vacate the ALJ's decision is based on violations of procedural rights, part 2, is DENIED. Part 3, the motion to vacate based on spoliation, is DENIED.

As for the parties' competing cross motions for summary judgment (ECF Nos. 45, 47), I am denying relief without prejudice to resubmission. I will order the parties to confer with the Magistrate Judge to set a schedule and agenda for rebriefing, and to determine whether any of the arguments should be withdrawn or reformulated in light of what has been decided here. I will further order that any requests for judgment on the administrative record, as I have permitted it to be supplemented, shall be presented as summary judgment motions which observe the requirements of Local Rule 56.1. They shall include, *inter alia*, a separate statement of material facts that cites specifically, by page number, to appropriate excerpts of documents such as administrative exhibits or hearing transcripts, which shall be sponsored by certifications or affidavits. In general, such items as motions and memoranda of law shall not be included. (They may be briefly excerpted to demonstrate that a point was raised before the ALJ, should that be in dispute.) The parties are cautioned that the motions should cite specifically to the most pertinent record items. Briefs shall comply with our page limits. The parties are further advised that oral argument will be granted, so that any points that appear to present a difficulty may be amplified by counsel.

# I.   BACKGROUND AND PROCEDURAL HISTORY

## A.   Initial Evaluations and Settlement[1]

A.A., born in 2006, is classified as autistic and therefore eligible to receive special education and related services. (RSF ¶ 1) In December 2008, when A.A. was just over two years old, Cecelia McCarton, M.D., performed a neurodevelopmental evaluation (the "McCarton Report") and recommended that A.A. receive 12 months of "ABA [Applied Behavior Analysis]1:1 discrete trial [] therapy for 40 hours weekly at home." (Pl.'s Br. 6; PA 162) I 2010, just before her fourth birthday, A.A. was referred to the Board for an initial child study team ("CST") evaluation. (RSF ¶ 2) The Board initially proposed to place her in its "Preschool Disabled" program at P.S. 22 for the 2010-11 school year, later changed to the "Autistic Program" at P.S. 31 for the 2011–12 school year. By the Parents' reckoning, each of these placement decisions was made without "anyone with expertise in the evaluation, treatment or education of children with autism or ABA." (Pl.'s Br. 7-8) In May 2011, the Parents unilaterally placed A.A. in the Caldwell Center for Autism and Applied Behavior Analysis

---

[1]     Citations to the record are abbreviated as follows:

"Pl. Br." — The Parents' Second Amended Brief in Support of Plaintiff's Motion to Supplement the Administrative Record, to Vacate the Administrative Decision, or, In the Alternative, to Reverse the Administrative Decision (the "Omnibus Motion"), ECF No. 49-1

"Pl. Reply Br." — The Parents' First Amended Brief in Further Support of Omnibus Motion, ECF No. 60

"Pl. Oppo. Br." — The Parents' Brief in Opposition to the Board's Motion for Summary Judgment, ECF No. 53

"Def. Br." — The Board's Brief in Support of its Motion for Summary Judgment, ECF No. 46

"Def. Reply. Br." — The Board's Brief in Further Support of its Motion for Summary Judgment, ECF No. 58

"Def. Oppo. Br." — The Board Brief in Opposition the Parents' Omnibus Motion, ECF No. 55

"PA __" — The Parents' Appendices, filed in support of its omnibus motion and in opposition to the Board's motion for summary judgment, ECF Nos. 47-2, 47-3, 48-2, 48-3, 54-1, 54-2, 54-3

"RSF" — The Parents' Response to the Board's Statement of Material Undisputed Facts, ECF No. 53-1

("Caldwell"). (RSF ¶ 5) Caldwell is not accredited by the State Department of Education for the education of children with disabilities. (RSF ¶ 6)

The Parents thereafter instituted due process proceedings seeking reimbursement and costs for A.A.'s attendance at Caldwell for the 2011–12 school year. The Parents retained Bobby Newman, PhD, who observed A.A. at Caldwell and performed psychological and behavior evaluations of A.A. in January and February 2012 (the "Newman Report"). (Pl. Br. 8) Newman opined that P.S. 31 was not an appropriate placement for A.A. and that she needed 12 months of at least 25 hours per week of ABA-based programming. (PA 197; PA 203)

The Parents also retained Anne S. Holmes, M.S., C.C.C., B.C.B.A., who wrote a consultation report (the "Holmes Report") on March 26, 2012. Based on the evidence reviewed, Holmes concluded that "P.S. 31 is providing its students with excellent services" but that the proposed placement "was not appropriate for [A.A.] at this time." She recommended that A.A. be placed in a year-round program with a "philosophy that is grounded in the principles of applied behavior analysis." (PA 214)

In May 2012, the Board and the Parents entered into a settlement agreement. The Board agreed to pay for A.A.'s attendance at Caldwell from July 2012 through June 30, 2013, pending A.A.'s acceptance at a school designated under the terms of the agreement. It was also agreed that the Board would reevaluate A.A. before the end of the 2012–13 school year. (RSF ¶ 7)

### B.    The 2013–14 Proposed IEP

From May 29, 2013 to June 14, 2013, the Board conducted educational, psychological, speech, occupational, and social history evaluations of A.A. (RSF ¶¶ 8-13) Following an eligibility and IEP meeting on July 1, 2013, it was determined that A.A.'s disability continued, and an IEP for the 2013–14 school year was proposed. Here is a summary of the 2013–14 proposed IEP:

> The proposed IEP recommended that A.A. be placed in a self-contained class for children with autism, with related services and an extended school year. Specifically, A.A. would receive instruction in language arts, reading, math, science, social studies, and electives/"Specials" five times per week. A.A. would receive speech therapy twice a week in a small group session for thirty minutes; A.A. would also receive occupational therapy once a week individually for thirty minutes and once a week in a small group for thirty minutes. A.A. would be afforded an opportunity to integrate with general education students daily in her Electives class period. A.A. would also receive extended school year services. The proposed IEP outlined objectives and goals for A.A. in the area of: self-care, fine motor skills, language and speech semantics and syntax, language and speech pragmatics, social and emotional development, language arts and literacy, mathematics, science, social studies, and family life skills.

(RSF ¶ 16) The IEP does not explicitly state that programming is to be based on ABA or Verbal Behavior Network ("VBN") principles.[2] It does note, however, that A.A.'s "family utilizes [an] ABA program with her and it seems to work well." (PA 243) The proposed placement is Cordero School, P.S. 137 ("Cordero"). (RSF ¶ 23)

The Parents object categorically to placement at Cordero. Reprising their objections to previous proposals, the Parents fault the Board for failing to include anyone on the evaluation team with expertise in autism or ABA and for offering a placement that lacked an "intensive ABA-based program."[3] (Pl. Br. 10) The Parents filed a petition for mediation challenging the proposed placement on July 15, 2013. Following an unsuccessful mediation between the

---

[2]     That omission I do not consider unusual. "As noted in the Federal Register, 'nothing in [the IDEA] . . . requires an IEP to include specific instructional methodologies . . . The Department [of Education]'s long-standing view on including methodologies in a child's IEP is that it is an IEP Team's decision.'" *W.D. Wat'chung Hills Regional Highschool Bd. of Educ.*, 602 F. Appx. 563, 568 (3d Cir. 2015) (quoting 71 Fed. Reg. 46,540, 46,665 (August 14, 2006).

[3]     Newman explains: "By intensive, I'm using the definition used in the research literature when they discuss intensive programs which involves 25 to 40 hours per week of teaching procedures, behavior management procedures, parent trainings, similar activities." (Pl. Br. 78)

Parents and the Board, an initial hearing before ALJ Moss was scheduled for February 5, 2014. (RSF ¶¶ 23-25)

## C.   Proceedings Before the ALJ

On January 10, 2014, the Parents requested that the Board allow their expert, Newman, (a) "to review a sample program book that includes individual instruction programs, treatment programs, graphs and data used in the proposed program" and (b) "talk to all staff that would be directly involved in implementing A.A.'s IEP, including her case manager, classroom teacher, related services providers, and any behavior specialist, supporting professionals, or consultants." (PA 1) The Board demurred; as for proposal (a), federal and state law prohibited it from disclosing other students' records, and as for (b), allowing an "interrogation" of Cordero staff would be too disruptive. (PA 3) Newman was permitted, however, to observe Mr. Redfern's class at Cordero (where A.A. would have been placed), and to ask Barbara Jo Pacifico-Batista, A.A.'s case manager, questions about the proposed program. Newman wrote a six-page report of his observations and conclusions. (PA 280)

So far as the Court is aware, the Parents never sought or obtained an order compelling the production of sample program books or other student data and records. On or about January 23, 2014, however, the Parents filed a "motion in limine" seeking to preclude the Board from introducing evidence about the placement unless it permitted Newman "reasonable access" to information about the placement at Cordero.[4] The Parents defined "reasonable

---

[4]     Around the same time, the Parents sought leave to file an amended due process petition and request "an Order directing the Board to develop an IEP for A.A. which provide[s] for the kind of intensive ABA based educational program that she requires to benefit from her educational placement." (PA 88). That request was denied by ALJ Moss, who admonished the Parents for attempting to "broaden the claim seven days before the scheduled trial date." (PA 88) This ruling implies that the ALJ was not considering the appropriateness of the IEP, broadly speaking, but focusing on the placement of A.A. at Cordero. (See also Compl. 5, ECF No. 1 (requesting an order "[f]inding the District's proposed placement of A.A. in a class within the District's Autistic program would not have offered A.A. FAPE during the 2013–14 school year".)

The distinction between the issue of the validity of the IEP itself and the issue of whether the IEP could be implemented at Cordero is not always carefully observed by the

access" as including, *inter alia,* the requested review of sample program books and records pertaining to other students. They argued that confidentiality concerns could be addressed by redaction of personal information. Finding that Newman was not entitled to the records of other students under New Jersey law, and that the Board had provided the Parents' expert reasonable access to Cordero, Judge Moss denied the Parents' in limine motion on February 20, 2014. (RSF ¶¶ 26-27)

Six days of evidentiary hearings were held before the ALJ between March 20, 2014, and July 3, 2014. (PA 120) Certain evidence about prior school years was excluded or limited. Because the Holmes Report concerned the IEP and proposed placement for the 2011–12 school year, that report was not admitted into administrative record. Similarly, while the ALJ did admit the McCarton and Newman Reports for the limited purpose of establishing and documenting A.A.'s autism, she did not consider their recommendations (*e.g.*, that A.A. needed an ABA-based program), because the evaluations were conducted in 2008 and 2012, respectively.[5] (Def. Opp. Br. 20-24) Newman, however, was allowed to testify about his current recommendations and observations of A.A. (Pl.'s Br. 26; Def. Opp. Br. 24) The ALJ also heard testimony from a number of the Board's witnesses, including two whose testimony is germane to the issues presented in this opinion. Those two witnesses' testimony may be briefly summarized as follows:

### 1.   Pacifico-Batista

Barbara Jo Pacifico-Batista, a Board employee, has worked as a CST case manager for approximately 10 years. She testified that she has been

---

parties—or even by the ALJ, who at one point in her decision states that "the issue in this matter is whether the education offered in the 2013–14 IEP to A.A. would have provided FAPE to A.A." (PA 146) In any renewed motions for summary judgment, the parties must clarify whether the validity of the 2013–14 IEP was in dispute before the ALJ, and whether it is being challenged (or even can be challenged) here. For purposes of this opinion, which is preliminary to the merits, I will take the broader view and assume that this appeal relates to the validity of the 2013–14 IEP.

[5]     I go by the description in the briefs. Apparently there is no record of these evidentiary rulings. (Pl. Br. 26 n. 11 & 12)

involved with the development of over a 1,000 IEPs. As case manager, she evaluated A.A. on three occasions: in 2010, for the initial evaluation; in 2011, when A.A. was aging out of preschool; and in 2013, pursuant to the parties' settlement agreement. Pacifico-Batista generally opined that A.A.'s skills had improved and that she was ready to join her peers in a less restrictive environment. (RSF ¶¶ 29, 33, 36-37, 40)

### 2.   Mr. Redfern

Richard Redfern would have been A.A.'s teacher pursuant to the proposed placement at Cordero. He holds degrees in special education, as well as a certificate from the New Jersey Department of Education as a Teacher of the Handicapped. Redfern was supported by behavioral analysts from VBN who were contracted to support the autism programs in the school district. At the time of the hearing, his class consisted of five autistic students. Redfern testified that his program is individualized as to each student and has a low student-to-staff ratio. He testified—although the Parents dispute this—that he instructs students using "100%" evidence-based, or ABA or VBN-based, techniques and methodologies; that he collects data daily from the students pursuant to those techniques; and that he would have been equipped to implement A.A.'s IEP at Cordero. (RSF ¶¶ 52-78)

### D.   The ALJ's Decision

On October 3, 2014, ALJ Moss issued a final decision and ruled that "the placement proposed by the District for A.A. was appropriate, individualized for A.A., and designed to provide A.A. with a meaningful benefit." (PA 147) Based on the evidence presented, she made the following findings:

First, the ALJ found the witnesses employed by the Board credible. In particular, the ALJ credited testimony that the proposed program uses an ABA methodology; that A.A.'s needs had changed since the initial evaluation in 2010; and that A.A. needed services, like speech and occupational therapy, that the Parents' selected facility, Caldwell, cannot provide. (PA 141)

9

Second, the ALJ found the Parents' expert, Newman, not credible. The ALJ found that Newman had a "business and social relationship" with Sharon Reeve, the executive director of Caldwell, which "greatly diminishes" his credibility and "lessens his objectivity." The ALJ also pointed out that Newman and Reeve had worked and presented a paper together; were co-authors of a book from which Newman receives all the royalties; and might have plans to work together in the future. The ALJ added that, unlike a number of the Board's witnesses, Newman had not evaluated A.A. since 2012. (*Id.*)

Third, the ALJ found that the proposed IEP outlined individualized objectives and goals in self-care, fine motor skills, language and speech, social and emotional development, language arts, mathematics, science, social studies, and family life skills. The ALJ also found that the proposed IEP addressed problem behaviors and identified strategies to prevent those behaviors.

The ALJ found, in short, that the IEP and placement at Cordero satisfied the requirement of IDEA that A.A. be provided with a FAPE. (PA 142, 147)

### E.   This District Court Action

On October 24, 2014, the Parents filed a complaint and requested that the Court (1) supplement the administrative record; (2) find that the Board failed to comply with the terms of a settlement agreement that resolved an earlier due process petition; (3) rule that the proposed placement at Cordero for the 2013–14 school year did not provide A.A. with a FAPE; (4) order the Board to keep A.A. at Caldwell unless she is accepted at one of the schools identified in the settlement agreement; and (5) award attorney's fees and costs. The Board answered the complaint on December 8, 2014. (ECF Nos. 1, 3)[6]

---

[6]     All parties agree that the settlement agreement is not relevant to the pending motions. I also note that the Board's alleged violation of the settlement agreement was not included in the Parents' request for mediation. Nor was it a subject of the administrative proceedings. *See* 20 U.S.C. § 1415(f)(3)(B); *id.*at (i)(2)(A).

Discovery, and discovery-related battles, ensued. As they did before the ALJ, the Parents sought documents that contained "data related to the performance or behavior of students" enrolled in the Cordero program for the 2013–14 school year. (PA 101) Eventually, the Board relented and turned over a "sample" of redacted student records and data, consisting of all of the records then available. The "records that were not produced were either . . . sent home with the parent(s) or  . . . destroyed at the close of the school year." (Def. Opp. Br. 16) In total, the Board produced redacted copies of Verbal Behavior Milestones Assessment and Placement Programs, ("VB-MAPPs"), IEPs, quarterly progress reports, sample graphs, activity and instruction sheets, Mand data, and reinforcement assessment forms for three students, all of whom attended Mr. Redfern's class in the 2013–14 school year. (PA 110-11)

On May 31, 2016, the deadline to file dispositive motions, the parties filed cross motions. (ECF Nos.45, 47) The Board moves for summary judgment and straightforwardly requests affirmance of the ALJ's decision. For their part, the Parents have filed a 114-page omnibus motion to "supplement the administrative record, to vacate the administrative decision, or, in the alternative, to reverse the administrative decision."[7] In the Parents' words, the motion is "essentially three motions, one to supplement the administrative record, a second to vacate the administrative decision based on the denial of reasonable access to proposed placement by Plaintiff's expert and the destruction of evidence by the District, and a third for reversal on the merits based on a preponderance of the evidence." (ECF no. 44)

On June 8, 2016, the Board belatedly filed what purports to be a statement of undisputed material facts pursuant to Local Rule 56.1. (ECF No. 50) This, however, fails to include any accompanying affidavits or the

---

[7]     This massively exceeds the page limitations of Local Rule 7.2. The Parents requested permission to file an overlength brief the same day the brief was filed. (ECF 44) *See* Local Rule 7.2(b) (Judge or Magistrate Judge's "special permission" to exceed page limit must be not just sought, but "obtained prior to submission of the brief").

documents to which it cites. The Parents have not filed a Rule 56.1 statement.[8] The Parents have given the Court over 600 pages' worth of "supplemental appendices"—a collection of emails, briefs, expert reports, transcript excerpts, and other documents, selected on some basis that is not quite apparent. (ECF Nos. 47-2, 47-3, 48-2, 48-3, 54-1, 54-2, 54-3)[9] Both sides, apparently assuming the administrative record is before the Court, cite to documents that I do not have.

In short, the papers before the court do not furnish a practical basis on which to decide cross-motions for summary judgment, and it would be a waste of everyone's time to try to do so. I will instead decide what can be decided now; namely, the Parents' motion to supplement the administrative record and vacate the ALJ's decision based on procedural violations and spoliation.

## II.   THE IDEA STATUTE

IDEA's purpose is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A).

---

[8]    The Parents offer the following explanation: "Plaintiffs do not seek summary judgement based on undisputed facts, but rather, that the decision below be either: 1) vacated because of the unreasonable denial of expert access to the proposed placement or the improper destruction of evidence, or 2) reversed because a preponderance of the evidence demonstrates that the proposed IEP and placement were not appropriate for A.A. Consequently, Plaintiffs did not file a motion for summary judgement, and, therefore, did not err by not filing a L.C.R. 56.1 statement of undisputed facts." (Pl.'s Reply Br. 2) It is true that, in an IDEA/FAPE case, summary judgment is "simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Heather S. v. State of Wis.*, 125 F.3d 1045, 1053 (7th Cir. 1997). All the same, it is summary judgment that the Parents have requested; if it was not clear before, I am making it clear now that unless a party seeks and obtains leave in advance for some other procedure, I will always require compliance with the usual summary judgment procedures. Noncompliance may result in dismissal.

[9]    For what it is worth, I note that the Board attempted to treat the statement of facts section from the Parents' omnibus motion as a 56.1 statement to which it could respond. (ECF No. 55-1) This valiant, alas failed, experiment only underscores the importance of a separately-filed statement of numbered, undisputed material facts that do not contain legal arguments or conclusions of law.

States have an obligation to ensure that children with disabilities receive FAPE," 20 U.S.C. § 1412(a)(1), in the form of special education "provided at public expense, under public supervision and direction." 20 U.S.C. § 1401(8). Such special education will be provided "in conformity with the individualized education program ["IEP"] required under Section 1414(d) of this title." *Id.*

A "child with a disability" is a "child [ ] with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness) . . . other health impairments, or specific learning disabilities, and [ ] who, by reason thereof, needs special education and related services." 20 U.S.C. § 1401(3).

## III.   DISCUSSION

### A.   Standards of Review

#### 1.   Plenary v. Due Weight

District courts must give "due weight' to the underlying administrative proceedings." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012) (citations omitted). A reviewing court must "accept the state agency's credibility determinations unless the nontestimonial, extrinsic evidence in the record would justify a contrary conclusion." *Id.* (internal quotations and citations omitted). Conclusions of law are given plenary review. Factual findings, such as whether a school district fulfilled its FAPE obligations, are reviewed for clear error. *Id.* Such ALJ findings "are to be considered prima facie correct, and if [a court does] not adhere to those findings, [it] must explain why." *Id.* (internal quotations and citations omitted). "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (internal quotations and citations omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574.

## 2.    Supplementing the Administrative Record

The IDEA provides that a District Court shall hear additional evidence at the request of either party. 20 U.S.C.A. § 1415(i)(2)(C)(ii). The right to supplement the record is not absolute; rather, the decision to admit additional evidence is committed to the discretion of the trial court. *See Susan N. v. Wilson Sch. Dist.,* 70 F.3d 751, 760 (3d Cir.1995). New evidence should be admitted if it would "assist the court in ascertaining whether Congress' goal has been and is being reached for the child involved." *Id.* at 760. "After-acquired evidence, such as information received through the experience of an alternative placement, should be used by the court only in assessing the reasonableness of the district's initial decisions regarding a particular IEP . . . . Courts must be vigilant to heed Judge Garth's warning that '[n]either the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement." *Id.* (quoting *Fuhrmann v. East Hanover Bd. of Educ.,* 993 F.2d 1031, 1040 (3d Cir. 1993). The burden of establishing the admissibility of additional evidence rests on the offering party and such evidence must be shown to be relevant, non-cumulative and useful. *See id., Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1471 (9th Cir. 1993).

**B.    Analysis**

**1.    Additional evidence**

The Parents ask the Court to supplement the administrative record with three categories of evidence: (1) the expert reports ALJ Moss excluded either in whole or in part; (2) interrogatory responses acquired in discovery in this action; and (3) an expert report from Newman based on after-acquired information. I agree with the Parents' first request, and will permit them to supplement the record with the expert reports. I also grant the Parents' second request that I consider the interrogatory responses. The Parents' third request, regarding the supplemental Newman report, is more problematic, but I will consider the report for limited purposes.

**i.    Excluded Expert Reports**

The Parents request that I consider the expert opinions of Drs. McCarton (written in 2008), Holmes (2012), and Newman (2012). All three, the Parents say, recommended an "intensive" ABA-based program for A.A. The Board counters that the ALJ correctly excluded these reports, either in whole or in part, because they were more than a year old at the time of the 2013–14 IEP and proposed placement. Even so, the Parents say, these reports demonstrate that A.A.'s persistent need for an "intensive" ABA-based program has been noted consistently by a number of consultants in different disciplines over time. (Pl. Br. 21)

There is no doubt that an opinion based on a January 2012 evaluation (let alone an opinion based on A.A.'s needs as a two-year-old in 2008) is less probative of A.A.'s educational needs in 2013–14 than an opinion based on a May 2013 evaluation. It is also true that the Holmes report is geared towards assessing the Board's proposal for the 2011–12 school year, which involved an entirely different placement. Nevertheless, to the extent that these reports corroborate A.A.'s need for some sort of ABA-based program, they are useful and relevant, if somewhat cumulative. Mindful of the lenient standard for the admission of new evidence on appeal of an ALJ's decision in

an IDEA case, I will consider the McCarton, Holmes, and Newman opinions for the limited purpose stated.

## ii.   Interrogatory Responses

*Interrogatory no. 3*:  The Parents also request that I consider an interrogatory response, Interrogatory no. 3, obtained after the ALJ's decision, which allegedly contradicts the Board witnesses' hearing testimony. The Parents point to Pacifico-Batista's testimony before the ALJ that Redfern's 2013–14 class would be supported by a board certified behavior analyst ("BCBA"); now, they say, the Board has furnished an interrogatory response to the effect that Redfern never consulted with that BCBA during the 2013–14 school year. (PA 99-100; PA 108) The Board concedes the contradiction. It points out, however, that A.A. didn't end up actually attending the Cordero program in 2013–14, and that Cordero did provide appropriate behavioral support services for the students who did attend. (Def. Opp. Br. 11) Pivoting, the Parents argue that the information is nevertheless relevant because it goes to "whether the proposed placement [was] capable of implementing the kind of ABA-based program" that A.A. needs. (Pl. Reply Br. 7)

ALJ Moss noted that a staff BCBA was slated to work in Redfern's classroom for at least part of the 2013–14 school year. (PA 128, 132) To the extent a full-time staff BCBA would have been required in order to implement the goals of A.A. 2013–14 IEP, it would indeed be useful to know whether the Board committed itself—or, as the Board implies, *would* have committed itself, had A.A. attended—to employing such resources at Cordero. In that limited sense, the interrogatory response could be somewhat relevant.

As after-acquired evidence, however, this interrogatory answer must be handled with great care. It can properly be used only to determine "the reasonableness of the district's initial decisions regarding a particular IEP or the provision of special education services at all." *Susan N.*, 70 F.3d 751; *Furhmann*, 993 F.2d at 1041 ("[T]he appropriateness of a student's placement must be assessed in terms of its appropriateness at the time it is created and

16

not at some later data when one has the benefit of the child's actual experience.") Here, the Parents do not argue—and the Court is not aware of any evidence that suggests—that the Board knew or intended at the time it proposed to place A.A. at Cordero that a staff BCBA would not provide behavioral support services to Redfern's class. Nor is there any evidence that the Board duped the ALJ into thinking that A.A. would receive behavioral support services at Cordero, when it knew she would not. And surely the Board was not required to supply phantom BCBA services for a student who wasn't there in order to preserve its position for this appeal.

The Parents' request comes very close to a demand that I evaluate the Cordero placement based on facts and events of which the Board, Parents, or ALJ Moss were not aware even as late as July 2014—a full year after the Board settled on the proposed IEP and Cordero. If projected back in time, this would be just the kind of *post hoc* determination prohibited by *Susan N.* I do not exclude this evidence from consideration, however; I have considered it, and do consider it. I find, however, that its minimal probativeness is limited to what the Board knew and thought when, in 2013, it developed the 2013–14 IEP, or as to what the BCBA situation would have been if A.A. had attended.

*Interrogatory no. 6*: The Parents argue that another interrogatory response, Interrogatory no.6, contradicts Redfern's testimony that he used individualized behavior reduction plans and skill acquisition programs for the students in his class. (Pl. Br. 29-30) Once again, I will not exclude the interrogatory response from my consideration. The contradiction, however, seems at best to be minor and generic. The interrogatory read: "State whether the District developed any individualized instruction programs . . . for any of the students enrolled in . . . Redfern's class during the 2013–14 school year." The Board replied: "[T]he District developed individualized educational programs, or 'IEPs,' for each student . . . The IEPs included behavior plans, when required, and individualized goals and objectives." (PA 101, 109-10)

That statement does not show, as the Parents suggest, that Redfern did not use individualized programming in his class. Rather, it appears consistent with the testimony cited by the Parents that Redfern uses individualized programming to the extent required by a *particular* child's needs. (PA 369-71; 382-84) I will consider this statement, but I find that that it is not particularly probative of the issue of whether Cordero was an appropriate placement for A.A.

### iii.  Supplemental Newman Opinion

Third, and finally, the Parents urge the Court to consider the supplemental opinion prepared by their expert, Newman. The supplemental opinion is based on the Board's interrogatory responses and a sample of redacted student records from the 2013–14 school year. The gist of Newman's opinion is that this evidence undermines the Board's claim that "everything" in Redfern's "classroom [is] data-driven" and demonstrates that "the program is not in fact data-based or data-driven or operated in manner consistent with principles of ABA." (RSF ¶ 65; Pl. Oppo. Br. 30) As I have already said, I do not consider the Board's interrogatory responses to be irrelevant, but neither do I find them to be central to the issues here. I therefore focus on the portions of Newman's opinion that rely on other students' records.[10]

This additional evidence is not typical of what has been found germane to an IDEA dispute. Most commonly, a district court is requested to consider "evidence of a child's progress—or lack thereof—in an alternative placement" following a school district's IEP and placement decisions. *See, e.g. L.G. ex rel E.G. v. Fair Law Bd. of Educ.*, 486 Fed. Appx. 967, 975 (3d Cir. 2015); *T.L. v. Lower Marion School Dist.*, Civ. No. 15-0855, 2015 WL 7252886, at *4-5, 15-22 (E.D. Pa. Nov. 17, 2015); *Dudley v. Lower Merion School Dist.*, Civ. No. 10-2749, 2011 WL 5525343, at *6-7 (.D. Pa. Nov. 14, 2011); *R.P. v.*

---

[10]     The Board principally argues that Newman's supplemental report should not be admitted because the ALJ found him not credible. I will not consider that issue at the level of admissibility of the report, although it may go to the weight I ultimately decide to give it.

*Ramsey Bd. of Educ.*, Civ. No. 06-5788, 2008 WL 4371368, at *3, 10-11 (D.N.J. Sept. 17, 2008). The additional evidence here, by contrast, is an expert opinion based on a sample of *after-acquired* records of *non-party students*, from *a school A.A. never attended.* Newman's opinion is thus multiple steps removed from the central merits of this dispute.

I am of course mindful of the Parents' theory here: that these records are offered, not to demonstrate the educational progress of those other children, but rather to demonstrate the instructional methodologies employed by Cordero staff during the 2013–14 school year. I therefore will accept Newman's report for that limited purpose. Once again, I stress to the parties that the collection of data (or not) regarding other students, with other educational abilities and disabilities, may turn out to say very little about what would have occurred if A.A. had attended Cordero in 2013–14. And it may say even less about the reasonableness of the Board's decision in 2013, based on what the Board knew in 2013. Accordingly, Newman's supplemental opinion will be added to the administrative record for the limited purposes identified here. I will grant the Board leave to submit a rebuttal report if it wishes to do so.

### 2.    The Parents' Motion to Vacate

The Parents argue that the ALJ's failure (1) to permit Newman access to a "sample program book that includes individual instructional programs, treatment programs, graphs and data used in the proposed program" and (2) "to talk to all staff that would be directly involved in implementing A.A.'s IEP, including her case manager, classroom teacher, related services providers and any behavioral specialist, supporting professionals or consultants" rendered them unable to "present evidence and confront, cross-examine, and compel the attendance of witnesses. (Pl. Br. 36); 20 U.S.C. § 1415(h)(2). A violation of the IDEA's procedural requirements is actionable "only if it . . . seriously deprives parents of their participation rights." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 565 (3d Cir. 2010).

### i.   Access to Student Records

The Parents argue that Newman should have been permitted to review other students' records because they are the type of information that is generally used in evaluating ABA-based educational programs and any sensitive information could have been redacted to protect the identities of the students. (Pl. Br. 39-40) The Board counters that the ALJ got it right: Newman was not authorized under New Jersey law to access these records, which in any case are irrelevant to whether the proposed placement provided a FAPE to A.A. (Def. Opp. Br. 9-12) To some degree, this dispute is mooted by supplementation of the record on this appeal, but I nevertheless discuss it as it bears on the ALJ's decision.

Both New Jersey and federal law obligate schools to protect the privacy of their students' records. *See* 20 U.S.C. § 1232g; N.J.S.A. § 18A:36-19. Under New Jersey's law, "student record" is broadly defined as "information related to an individual student gathered within or outside the school district and maintained within the school district." N.J.A.C § 6A:32-2.1. Access to student records is limited to authorized organizations or individuals; generally, "[p]ersons outside the school" are authorized to view confidential student records if the students' parents consent (and consent to any third-party disclosure) or a court orders it. *Id.* at 7.5(e)(14),(15). Similarly, under the Family Educational Rights and Privacy Act ("FERPA"), federal law prohibits the disclosure of an "educational record" that contains information "directly related to a student", including her name, address, or "other information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty" to an unauthorized individual. *See generally* 20 U.S.C. § 1232g; 34 C.F.R. 99.3. FERPA likewise allows for the disclosure of such records

20

with parental consent or as a result of a court order. 20 U.S.C. § 1232(g)(b)(2).[11]

Here, the Parents do not argue that they were wrongly denied access to the records of other students, despite parental consent or a court order. The argument seems to be a more amorphous one that the Board *could* have given Newman student records, if they had been redacted. *Cf.* N.J.A.C. 6A:32-7.5(g) (incorporating the requirements of New Jersey's Open Public Records Act, N.J.S.A. § 47:1A-1.1, which prohibits the disclosure of student records "to the extent disclosure would reveal the identity of the student"); *see Ragusa v. Marverne Union Free School Dist.*, 549 F. Supp. 2d 288, 293 (E.D.N.Y. 2008) ("[T]here is nothing in FERPA that would prohibit Defendants from releasing education records that had all 'personally identifiable information' redacted."). That is true—under certain circumstances. *Had* the Parents secured a court order, for example, the Board *could* have produced redacted records under federal and state law. Absent such an order, the Board had no obligation to give Newman indisputably confidential records—especially ones that it contends (though the Parents say otherwise) are irrelevant to whether Cordero and the 2013–14 IEP provided a FAPE to A.A.[12]

The Parents might have forced the Board's hand as to redaction by obtaining an order to compel.[13] But they didn't. Instead, the Parents tried to

---

[11]   New Jersey law expressly incorporates the requirements of FERPA. N.J.A.C. § 6A:32-7.5(g). There appears to be no dispute that the information is covered under both statutes.

[12]   Under Section 1:6A-10.1 of the New Jersey Administrative Code, "[e]ach party shall disclose to the other party any documentary evidence and summaries of testimony intended to be introduced at the hearing." To the extent the Board did not intend to rely on the records of other students at the hearing, it was not obliged to hand them over.

[13]   To that end, I note that it does not appear that the Parents ever attempted to serve or enforce a subpoena to collect the student records it sought prior to filing their motion in limine. *See* N.J.A.C. §§ 1:6A-10.1(d) (providing that discovery in IDEA cases shall be informal and prohibiting interrogatories, requests for admissions, and depositions); 1:6A-1.1(a) (providing that New Jersey's Uniform Administrative Rules apply on issues on which New Jersey's special rules for IDEA cases are silent); 1:1-11.1 (rules for subpoenas); 1:1-1-10.4 (rules for motions to compel). By any measure, it would have been unduly harsh for the ALJ to order the wholesale exclusion of the Board's proofs unless it vaguely provided the Parents with "reasonable access" to information the Parents never subpoenaed or moved to compel.

21

leverage the Board's failure to turn over the records into an in limine ruling precluding the Board from introducing other evidence.[14] That maximalist position had a potentially large strategic payoff, but also a slim chance of success. The Parents did not present their motion as one to compel production, and the ALJ was not required to recast it as one. The first hint that the Parents desired an order to compel occurred only *after* the Board pointed out the Parents' failure to seek such relief. (*Compare* PA 10-24 *with* PA 45, PA 80) I cannot, in short, fault the ALJ for ruling on the motion that was before her. In that context, the ALJ plainly did not err in ruling that Newman was not a person authorized under New Jersey law to inspect those third-party records, and to deny the Parents' motion in limine to preclude the Board from presenting its case.

      Even if the Parents had clearly presented a motion to compel, however, the ALJ would not have erred in denying it. The Parents claim that they have a strong interest in other students' records because those records are needed to determine whether Cordero is sufficiently ABA-based for A.A.'s needs. *See Ragusa*, 549 F. Supp. 2d at 291 (noting that the party "seeking disclosure of education records protected by FERPA bears a significantly heavier burden to justify disclosure than exists with respect to discovery of other kinds of information, such as business records") (quoting *Rios v. Read*, 73 F.R.D. 589, 598 (E.D.N.Y. 1977)).[15] As the ALJ pointed out, however, the

---

[14]    The Parents requested the following relief in their motion in limine:

      1. Petitioners' Motion in Limine is granted; and

      2. Respondent Jersey City Board of Education shall be precluded from introducing any evidence regarding the class and program it has proposed as a special education placement for A.A., unless it permits Petitioners' expert, Dr. Bobby Newman, reasonable access to the proposed placement, including an opportunity to observe the proposed class, review a sample student program book (including individual programs, data and graphs), and talk to staff directly involved in the implementation of the proposed class.

(PA 9)

[15]    Although there the Court is not aware of any decisions addressing the circumstances in which a school district may order the disclosure of student records under New Jersey law, I will

records of the other students who attended Cordero would have very little, if any, bearing on whether the Board provided A.A. with FAPE. That ruling is sound.

FAPE, as a matter of law, is personalized to the student so the instructional methods used for one child have little bearing on whether another child would receive a FAPE. *See Hendrick Hudson Cent. Sch. Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 181, 203 (1983) ("The [FAPE] required by [IDEA] is tailored to the unique needs of the handicapped child . . . [The state] satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."). The data collected and instructional methods used for the students who did attend Cordero for the 2013–14 school year was pursuant to *each* child's *personalized* IEP. Encouraging satellite litigation over whether the IEP and instructional methods used for one student is congruent with needs of another is hardly consistent with Congress' goal that each student be provided with a FAPE "designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). Indeed, the Parents cite to no IDEA case in which the plaintiffs' expert was permitted to review other students' records in order to determine the suitability of a proposed placement for the child involved. (Pl.'s Br. 46-48) (citing *Ragusa*, 549 F. Supp. 2d at 290 (employment discrimination); *Furley v. Wolfe,* Civ. No. 10-1820, 2011 WL 597038 (E.D. Pa. Feb. 18, 2011) (42 U.S.C. § 1983 civil rights claim); *Natasia v. New Fairfield Sch. Dist.*, No. Civ. 3:04-9245, 2006 WL 1699599 (D. Conn. June 19, 2006) (Title IX sexual harassment); *Davids v. Cedar Falls Community Schools*, Civ. No. C96-2071, 1998 WL 34112767 (N.D. Iowa Oct. 28, 1998) (racial discrimination); *Rios*, 73 F.R.D. 589 (Title VI and the equal protection clause). In sum, to the extent that the Parents' motion in

assume for the purpose of argument that they are similar, if not the same, as those under federal law. *Cf. C.G. Winslow Tp. Bd. of Educ.*, 443 N.J. Super. 415, 428 (Sup. Ct. Law. Div. 2015) ("The unofficially-named 'Pupil Records Act' operates in conjunction with FERPA to safeguard pupil records. The PRA attempts to balance the competing interests of access to records and 'reasonable privacy.')

limine is read as a request for an order to compel redacted student records, the ALJ would not have erred in declining to grant it.

At any rate, particularly in light of the supplementation of the record on appeal, the Parents cannot demonstrate prejudice. *See* Section III.B.2.iii, *infra.*

### ii.    Access to Cordero Staff

The Parents also say the ALJ abused her discretion in denying Newman "access to staff directly involved in implementing the proposed placement." (Pl. Br. 49-55) While Newman was permitted to observe and discuss the program with Pacifico-Batista, a Cordero staff member, the Parents contend that Newman should have also been allowed to interview other staff members who would have had "the kind of information needed to properly evaluate the program." (Pl. Br. 55) There is no evidence, however, that Pacifico-Batista was unable answer Newman's questions or provide the information he needed in order to offer an opinion about Cordero at the time of the observation in March 2014. If anything, Newman's write-up of his two-hour observation of Cordero indicates that the opposite is true. (*See, e.g.*, PA 280 ("Barbara Pacifico sat with me and answered all questions, although occasionally Mr. Redfern would provide information as well in response to a direct question from Mrs. Pacifico, or hearing the question I had asked Mrs. Pacifico."))[16] Newman had adequate access to Cordero. The Parents' participation rights were not violated.[17]

---

[16]    This also contradicts the Parents' claim that they were not afforded access to a staff member who was "involved in delivering or supervising instruction for students"—Redfern, in fact, was the teacher of the proposed class.

[17]    *S.B. and K.B. v. Park Ridge Board of Education*, on which the Parents heavily rely in making both of their access arguments, is inapposite. EDS 13813-08, 2009 WL 1574247 (N.J. Admin. Apr. 21, 2009) There, ALJ Richard Gill excluded all of a school district's evidence concerning a proposed placement as a sanction for its refusal to allow the plaintiff's expert access to the proposed placement *after the court had ordered such access*. The Parents, because they did not seek a court order, cannot obtain an *S.B.*–style sanction based on disobedience of such an order. Rather than support the Parents' position on appeal, *S.B.* highlights its deficiencies.

Finally, as in the case of the student records, the Parents cannot demonstrate prejudice. *See* III.B.2.iii, immediately following.

### iii.    Supplementation of Record/Lack of Prejudice

As to both the access to records and the access to Cordero, *see supra,* I am persuaded—particularly in light of the supplementation of the record on appeal—that the Parents will not be prejudiced.

The Parents have been granted access to Cordero and its student records sufficient to test their contention that Cordero was not equipped to provide A.A. with a FAPE. At the administrative level, their expert was permitted to observe and interview Pacifico-Batista and Redfern. *See* Section III.B.2.ii, *supra.* Although the ALJ justifiably denied access to other students' records and data, *see* Section III.B.2.i, *supra,* that is not the end of the story. As noted above, *see* Section I.E, *supra,* in connection with federal court discovery the Board has turned over student records that it still possesses.[18] I have permitted the Parents to introduce a supplemental expert report based on those records, *see* Section III.B.1.iii, *supra.*

To look at it another way, if this had been an evidentiary dispute in federal court, the balancing test of Fed. R. Evid. 403 would have applied. Considering the probativeness of the evidence, the privacy concerns involved, and the potential for diversion from the main issues, a court would likely have led to the same result reached by the ALJ. At any rate, the supplementation of the record before this Court should remove any likelihood of prejudice.

---

[18]    As noted above, in federal court discovery, the Board turned over a "sample" of redacted student records and data. That sample comprised all of the available records for the 2013–14 school year. In total, the Board produced redacted copies of Verbal Behavior Milestones Assessment and Placement Programs, ("VB-MAPPs"), IEPs, quarterly progress reports, sample graphs, activity and instruction sheets, Mand data, and reinforcement assessment forms for three students, all of whom attended Mr. Redfern's class in the 2013–14 school year. (PA 110-11)

### 3.   Spoliation

Apart from various allegations of violations of their procedural rights under the IDEA, the Parents claim reversal is warranted because the board destroyed or otherwise disposed of student records from the 2013–14 school year. Spoliation occurs where: "(1) the evidence was in the party's control; (2) the evidence is relevant to the claims or defenses in the case; (3) there has been actual suppression or withholding of evidence; and (4) the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv.*, 665 F.3d 68, 73 (3d Cir. 2012). The Parents cannot make the required showing.[19]

As to factors 2, 3, and 4, which are interrelated, I note that the student records the Parents seek became unavailable in the ordinary course of business, as a result of the school's reasonable compliance with its duties to other students and their parents. The Board's terminology—that it provided a "sample" of the relevant documents—is perhaps not well chosen; the "sample" comprised all of the documents then available.

In accordance with the school's policies, at the end of the school year, the records were either sent to the parents or, if unclaimed, destroyed.[20] That even-handed policy is consistent with New Jersey law, and does not bespeak an intent to destroy evidence. N.J.A.C. § 6A:32-7:8(b) ("Student records . . . may be disposed of after the information is no longer necessary to provide educational services *to a student.*") (emphasis added). To be sure, the Parents sought these third-party records in connection with the ALJ proceedings, and then made them the subject of a motion in limine. The ALJ ruled that the documents were *not* discoverable, and I would not disturb that ruling. *See* Sections I.D, III.B.2.i, *supra.* Moreover, as noted above, the Parents never made an unequivocal request to compel their production or to obtain a

---

[19]   Factor one is undisputed.

[20]   I make no finding on the point, but it appears that the documents that remained available were those that were in student files maintained by Mr. Redfern.

26

court order to that effect. We therefore are not presented with a case of noncompliance with a court order, or even an ALJ order. *First Sr. Financial Group LLC v. Watchdog*, 12-cv-1247, 2014 WL 1327584, at *9 (E.D. Pa. April 3, 2014) (finding bad faith where party acted recklessly "without notification or care for compliance" with a court order).

More generally, the Board seems to have complied with a reasonable document retention policy, and it had no reasonable expectation, based on established law, that it would be required to maintain *other* students' records in connection with *this* student's claims. Specifically with respect to factor three, the Parents concede that "they do not know if Redfern or anyone from the District intentionally destroyed the evidence to keep it from the Plaintiffs," and offer no evidence to suggest otherwise. (Pl.'s Br. 62); *Bull*, 665 F.3d at 68 ("[A] finding of bad faith is pivotal to a spoliation determination. . . . Withholding requires intent.") *See also Bozic*, 912 F. Supp. at 270 ("Almost all of the district court cases applying *Bull* of which this court is aware have declined to find spoliation where the party's conduct was no worse than negligent, or where the evidence was lost in the normal course of daily business or other similar activity.")[21]

Given the total mix of information and the circumstances, I am unable to conclude that the Board's conduct, "considered as a whole, rises well above the inadvertence, negligence, inexplicable foolishness, or part of the normal activities of business or daily living, any of which arguably fall outside the spoliation definition set forth in *Bull*." *Bozic*, 912 F. Supp. at 270. The picture that emerges is that the District complied with its usual policy of returning records, in which parents have a vital interest, to the parents; that the school produced records that Redfern, as the students' teacher, had

---

[21]      The Parents instead argue that the Board acted "with a reckless disregard" towards the importance of other students' records to the case of A.A. *Bozic v. City of Washington, Pa.*, 912 F. Supp. 2d 257, 269 (W.D. Pa. 2012). Assuming *arguendo* that a bad faith finding may be predicated on something less than specific intent to prevent evidence from being used by an adverse party, *see United States v. Nelson*, 481 Fed. Appx. 40, 42 (3d. Cir. 2012), it cannot be found on these facts.

maintained; that the records are in any event marginally relevant; and that they post-date, and were not part of the basis for, the Board's 2013 decision.

The claim of spoliation seems to be in part an attempt to undo the ALJ's ruling that this material was not discoverable in the first place. I have affirmed the ALJ's discovery rulings, but the spoliation claim is broader than that. The spoliation claim also seems to relate to discovery requests served in this Court. Out of caution, the Magistrate Judge and I have granted the Parents some leeway in supplementing discovery and expanding the record on appeal. In doing so, I do not vacate the ALJ's well-considered discovery decision or open the door to a claim of spoliation before the ALJ. For the reasons expressed above, I further deny any independent claim of spoliation with regard to federal court discovery.

## IV.   CONCLUSION

For the foregoing reasons, the cross-motions for summary judgment (ECF nos. 45, 47) are DENIED as presented, without prejudice. The Parents' associated motion to supplement the record is GRANTED on the limited basis discussed above. The Parents' motion to vacate the ALJ's decision on the grounds of violations of procedural rights or spoliation is DENIED. I reserve ruling on all other issues pending a conference before the Magistrate Judge and any resubmitted motions for summary judgment, which shall conform with my instructions at p. 3 of this Opinion, *supra*, and shall conform in every respect with the Local Rules of this Court.

Dated: December 29, 2016

KEVIN MCNULTY
United States District Judge